# IN THE SUPREME COURT OF TENNESSEE
## SPECIAL WORKERS' COMPENSATION APPEALS PANEL
### AT NASHVILLE
November 26, 2007 Session

## REX BROWN v. UNITED PARCEL SERVICE, INC. and LIBERTY MUTUAL INSURANCE COMPANY

**Direct Appeal from the Circuit Court for Maury County**
**No. 10991      Jim T. Hamilton, Judge**

---

**No. M2007-00343-WC-R3-WC - Mailed - January 29, 2008**
**Filed - April 1, 2008**

---

This workers' compensation appeal has been referred to the Special Workers' Compensation Appeals Panel of the Supreme Court in accordance with Tennessee Code Annotated section 50-6-225(e)(3) for a hearing and a report of findings of fact and conclusions of law. The Appellant suffered a stroke while performing his job as a package car driver for his Employer. The stroke occurred while he was being trained to take over a new delivery route. The Employee sought workers' compensation benefits, alleging that the stroke was precipitated by stress associated with his job, particularly with the adjustment to the new route. In preparation for trial, the Employer took discovery depositions of two medical experts identified as potential witnesses by its Employee. The Employee did not take evidentiary depositions of those witnesses, but sought to introduce their discovery depositions as evidence at trial. The trial court admitted the depositions into evidence over the objection of the Employer. The trial court found that the Employee's stroke was the result of an occupational disease, precipitated by work-related stress, and awarded permanent total disability benefits. The Employer has appealed, contending that the trial court erred by admitting the discovery depositions into evidence, and finding that the Employee's stroke was a compensable event. We find that the depositions should not have been admitted into evidence, in accordance with Rule 32.01(3) of the Tennessee Rules of Civil Procedure. After a review of the record without consideration of the depositions, we reverse the judgment of the trial court awarding permanent disability benefits for the stroke and dismiss the portion of the complaint relating to the stroke. The award for an injury to the Employee's shoulder is not questioned and that portion of the judgment is affirmed.

**Tenn. Code Ann. § 50-6-225(e) (Supp. 2007) Appeal as of Right; Judgment of the Circuit Court Affirmed in part and Reversed and Dismissed in part.**

JERRY SCOTT, SR. J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., J., and ALLEN W. WALLACE, SR. J., joined.

David T. Hooper, Nashville, Tennessee, for the Appellants, United Parcel Service and Liberty Mutual Insurance Company

Robert J. Martin, Clarksville, Tennessee, for the Appellee, Rex Brown

**OPINION**

**Factual and Procedural Background**

The Employee, Rex Brown, was a package car driver for United Parcel Service (UPS). He suffered a compensable shoulder injury in October 1997. That injury was included in this lawsuit, but is not at issue on appeal. Shortly after the shoulder injury occurred, Mr. Brown suffered a stroke while at home. He did not seek benefits for that stroke in this lawsuit, but did assert at trial that it was caused by employment-related stress. Another stroke in 2000 is the subject of this lawsuit.

Mr. Brown began working for UPS in 1979. He worked out of the Columbia hub for most of that time and drove the same route for eighteen years. In early 2000, Mr. Brown chose to move to another route, although he had sufficient seniority to retain his former route. He was placed on what is referred to as a "training route." Based upon his observations, he believed that the new route would require somewhat less time and effort to complete each day's work.

Mr. Brown began work on his new route on March 27, 2000. On that day, and the next two days, he was accompanied by his supervisor, Terry Holder. That was the normal practice for UPS, and was for the purpose of assisting its employees to learn the details of their newly assigned routes. While on duty two days later, Mr. Brown began to suffer symptoms of a stroke. He called his wife, who picked him up and took him to his doctor, who sent him to the hospital. He was diagnosed as having suffered another stroke. He has not worked since that time. The second stroke is the event at issue on appeal.

Mr. Brown testified that he was under a great deal of stress at work. He had conflicts with management for at least a year, and as a result, had filed three grievances in May and June, 1999. He apparently believed, though it is not clear that his belief had any basis, that changes might be made to his route. That possibility was one of the reasons he opted for the training route. Although he chose that route because he believed it would be easier, by his third day working with Mr. Holder, he became concerned that he might not be able to handle the route alone. Both his testimony and the medical evidence indicated that work stress could have been considered a contributing factor to his 1997 stroke. A co-worker testified that the day-to-day work of a UPS delivery driver was very stressful. In his testimony, Mr. Holder agreed with the co-worker.

According the testimony of Mr. Brown and Mr. Holder, the day on which the stroke occurred and the two preceding days were normal workdays. Mr. Brown referred to the day of the stroke as "just an average day." The work was no more physically demanding or stressful than usual. There were no unusual occurrences. Mr. Brown and Mr. Holder had known each other for years, and were

-2-

on good terms. There was no confrontation or acrimony between them. At the time Mr. Brown began experiencing the symptoms of his stroke, he was riding in the jumpseat of the delivery truck, and Mr. Holder was driving.

Dr. Louise Dobbs Younger Ledbetter, a neurologist, was Mr. Brown's treating physician for both the 1997 and 2000 strokes. She testified that he had a number of risk factors for stroke, including a history of smoking, a family history of hypertension and heart disease, a previous diagnosis of hypertension, and a genetic predisposition for blood clots, called "Factor V." She testified that Mr. Brown suffered a stroke on March 29, 2000. She opined that the event was work-related in that Mr. Brown's "hypertension was exacerbated by stress at work, which is a well-known precipitant of strokes and vascular disease." She was not aware of any acute stressful event which precipitated the stroke, but testified that she believed "that over a long period of time he had been under abnormal stress, trying to keep up with activities that he was physically unable to perform."

There is no indication in Dr. Ledbetter's testimony, or any of the other medical evidence, that the March 29, 2000 stroke was caused by any act or acts of physical exertion. She assigned a total anatomical impairment rating of 23% to the body as a whole due to the stroke. She did not believe Mr. Brown was capable of working due to the factors which precipitated the stroke and the damage it caused.

Dr. Garrison Strickland, also a neurologist, conducted an independent medical evaluation (IME) at the request of UPS. He testified that it was possible that the March 29 event had not been a stroke, but rather a trans ischemia attack (TIA), a less serious cardiovascular event. This was based upon his review of CT scans taken before and after March 29, 2000. He also opined that the TIA was caused by several pre-disposing factors in Mr. Brown's anatomy. He did not believe the TIA was precipitated by work stress because Mr. Brown was being assisted by another person at the time the stroke occurred, and therefore, he would have been under somewhat less stress than usual. He also stated that "[o]ther than some extreme event like an altercation, I would not consider just a stress of everyday living to be a major contributor [to causing a stroke] for most people."

Dr. Albert S. Callahan, III, another neurologist, also conducted an IME of Mr. Brown, apparently at the request of his attorney. His discovery deposition was taken by counsel for UPS. In a written report, Dr. Callahan expressed the opinion that it was "more likely than not that stress played a role in the occurrence of the stroke in March 2000." During his discovery deposition, he stated that this was based in part upon Mr. Brown's statement that the stroke "was preceded by an especial intense period of work." He agreed with Dr. Ledbetter that Mr. Brown was unable to work.

Dr. James Kelley was Mr. Brown's primary care physician. His discovery deposition was taken by counsel for UPS. Dr. Kelley opined that the March 2000 stroke was related to stress in the workplace, and that Mr. Brown was totally disabled.

Mr. Brown offered the discovery depositions of Dr. Callahan and Dr. Kelley as evidence at trial. Prior to the trial, UPS filed a motion in limine to exclude the depositions, based upon the

authority of Tennessee Rule of Civil Procedure 32.01(3). At trial, counsel for UPS again objected to the admission of the depositions on the same basis. The trial court denied the motion, overruled the objection, and admitted the depositions as evidence.

On the date of trial, Mr. Brown was fifty-eight years old. He was a high school graduate. He had worked for UPS, primarily as a package car driver, from 1979 until 2000. His prior work history is not revealed in the record. He had not worked, or attempted to work, since March 29, 2000.

The trial court awarded 12.5% permanent partial disability to the body as a whole due to the shoulder injury. That award is not at issue on appeal. The trial court also awarded a total of 400 weeks disability benefits, for 100% permanent total disability to the body as a whole, as a result of the stroke.

**Issues Presented**

UPS presented six issues on appeal:

(1) Did the trial court err by admitting and then relying on the discovery depositions of Dr. Alfred S. Callahan and Dr. James B. Kelley, the two medical experts deposed by UPS, into evidence?

(2) Did the trial court err in finding that Mr. Brown suffered from an occupational disease?

(3) Did the trial court err in holding that although extraordianry or unusual stimulus must be present for a stroke to be compensable for an accident, it need not be the case in the event of an occupational disease?

(4) Did the trial court err in finding that the stress from Mr. Brown's work was sufficient to determine that his stroke arose out of his employment?

(5) Did the trial court err in applying to these facts the finding that normal activities can trigger preexisting conditions in a non-physical exertion stroke case, rendering them compensable?

(6) Did the trial court err in its award of certain discretionary costs?

**Standard of Review**

We review issues of fact de novo upon the record of the trial court accompanied by a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn. Code Ann. § 50-6-225(e)(2) (Supp. 2007). When credibility and weight to be given testimony

are involved, considerable deference is given the trial judge when he or she had the opportunity to observe the witness' demeanor and to hear in-court testimony. Humphrey v. David Witherspoon, Inc., 734 S.W.2d 315, 315 (Tenn. 1987). However, an appellate court may draw its own conclusions about the weight and credibility to be given to expert testimony when all of the expert proof is by deposition. Krick v. City of Lawrenceburg, 945 S.W.2d 709, 712 (Tenn. 1997). A trial court's conclusions of law are reviewed de novo upon the record with no presumption of correctness. Ridings v. Ralph M. Parsons Co., 914 S.W.2d 79, 80 (Tenn. 1996).

**Analysis**

**Admission of Discovery Depositions of Experts Into Evidence**

As set forth above, counsel for UPS took the discovery depositions of Dr. Callahan and Dr. Kelley after Mr. Brown identified them as witnesses. The trial court admitted the depositions into evidence over the objections of UPS.

Rule 32.01(3) of the Tennessee Rules of Civil Procedure provides:

> The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds that the witness is "unavailable" as defined by Tennessee Rule of Evidence 804(a). But depositions of experts taken pursuant to the provisions of Rule 26.02(4) may not be used at the trial except to impeach in accordance with the provisions of Rule 32.01(1).

At the beginning of each deposition, counsel for UPS stated on the record that the deposition was being taken for discovery purposes because the deponent had been identified by Mr. Brown as a potential witness.[1] Counsel for Mr. Brown questioned each witness after counsel for UPS had finished his questioning. There is no notice, document, letter, statement on the record or evidence of any other type that Mr. Brown intended to take evidentiary depositions immediately upon the conclusion of the discovery depositions or at any other time. Assuming arguendo that Mr. Brown's counsel could have initiated an evidentiary deposition spontaneously by making an announcement to that effect, he did not do so.

The advisory comment to Rule 32.01(3) of the Tennessee Rules of Civil Procedure states:

> The new sentence . . . at the end of 32.01(3) protects the trial lawyer who

---

[1]In its brief on appeal, and at trial, UPS stated that both doctors were identified as expert witnesses. There is nothing in the record to substantiate this. However, counsel for Mr. Brown did not dispute that characterization. Dr. Kelley was potentially a "hybrid" fact/expert witness, in that he had personal knowledge of Mr. Brown's medical history, but also offered opinions concerning causation and disability. To the extent that he might be considered a fact witness, there was no evidence offered to demonstrate that he was unavailable to testify at trial. Therefore the same analysis used for expert witness testimony is applicable.

-5-

takes an opposing expert's discovery deposition by court order or by agreement from being confronted with the deposition as substantive proof at trial. Tactically the discovering lawyer wants to find out everything the expert intends to say at trial and conducts a very open inquiry, expecting many unfavorable answers; there is no cross-examination in the trial sense. It would be unfair to plaintiffs and defendants alike to have such a deposition admitted as former testimony on the ground that the deponent is unavailable, whether dead, outside the jurisdiction, or more than one hundred miles from the courtroom. If the party who hired the expert wants to take a deposition for proof, of course, that can be accomplished by notice or agreement. The present amendment applies only to a discovery deposition of the adversary's expert.

The situation presented by this case fits squarely within the language and intent of the rule. Mr. Brown's counsel did not explain his failure to take evidentiary depositions. He argues that the trial court did not err in admitting the discovery depositions because counsel for UPS "could not have seriously believed that these two physicians would be called live." He also asserts on appeal that the trial court could have granted a continuance to allow him to take the depositions. However, Mr. Brown's counsel did not request a continuance in the trial court. We conclude that the trial court erred by admitting and considering the evidence in the discovery depositions.

Mr. Brown's counsel also argues that this evidence "played a minor role" in his case, implying that any error in admitting the depositions was harmless. We do not agree. Mr. Brown cites testimony from the depositions in his brief in support of his position on causation. Further, in its memorandum decision, the trial court specifically referred to the opinions of Dr. Callahan and Dr. Kelley in support of its finding on the issue of causation. UPS contends that the evidence preponderates against that finding. It is our obligation to review the entire record de novo concerning that issue. Tenn. Code. Ann. § 50-6-225(e)(2)(Supp. 2007). Because the medical proof was presented to the trial court by deposition, we are able to reach our own conclusions concerning the weight of that evidence. Krick, 945 S.W.2d at 712. We have excluded the contents of the depositions from consideration as we address the issue of causation.

### Occupational Disease, the Stroke and Causation

UPS has raised four issues concerning the trial court's finding regarding occupational disease, the stroke and its causation. Because the trial court's decision, and Mr. Brown's position on appeal, mix elements of causation related to heart attacks and strokes generally, injuries caused by mental stimulus, gradual injuries and occupational disease, it is appropriate to consider all of Mr. Brown's theories and his employer's issues on causation together in light of the Tennessee workers' compensation case law.

In Bacon v. Sevier County, 808 S.W.2d 46, 49 (Tenn. 1991), the Supreme Court noted that

"[a]nalyzed causationally, the heart attack cases may be categorized into two primary groups: those that are precipitated by physical exertion or strain and those resulting from stress, tension, or some type of emotional upheaval." If physical exertion is the alleged cause, "no extraordinary exertion or unusual physical strain need be established in order to obtain a recovery." Id. at 50. Normal physical activity associated with the job, if proven to have precipitated the event, is sufficient to establish causation. Id. The same analysis is applied in analyzing strokes. See Houser v. Bi-Lo, Inc., 36 S.W.3d 68, 71 (Tenn. 2001). In this case, there is no contention, nor evidence, that Mr. Brown's stroke was caused by any physical activity. His theory, at trial and on appeal, is that his stroke was precipitated by stress arising from his job.

"[I]n order to recover when there is no physical exertion, but there is emotional stress, worry, shock, or tension, the heart attack [or stroke] must be immediately precipitated by a specific acute or sudden stressful event, rather than generalized employment conditions." Bacon, 808 S.W.2d at 52. UPS contends that the evidence in this case fails to satisfy that standard because there was no evidence presented that a sudden event occurred, nor medical evidence that Mr. Brown's stroke was precipitated by a specific acute or sudden stressful event.

Mr. Brown contends that the Bacon standard does not apply in this case because, he is seeking compensation for an occupational disease, rather than an injury. Id. However, he did not identify at trial or in his brief the occupational disease for which he is seeking relief. The record supports the conclusion that he had coronary artery disease, peripheral vascular disease and hypertension, among other conditions. However, all of the cases which consider strokes and heart attacks involve pre-existing conditions such as these. An extended discussion and listing of cases on the subject is contained in Bacon. 808 S.W.2d at 50-52. Moreover, the disability for which Mr. Brown seeks relief in this action arose from a single event, the stroke which occurred in March 2000, rather than any underlying disease process. In any case, the same standard would apply for any condition alleged to be the result of a solely mental or emotional stimulus. In Bledsoe v. City of Dickson-Dept. of Police, No. M2005-00919-WC-R3-CV, 2006 WL 1815808, at *6 (Tenn. Workers' Comp. Panel May 25, 2006), the policeman employee sought recovery for disability resulting from hypertension caused by job stress. His claim was explicitly based upon an occupational disease theory. Id. The Special Workers' Compensation Appeals Panel reversed an award of benefits, applying the standards set forth in Bacon, 808 S.W.2d at 52, and Houser, 36 S.W.3d at 72. Bledsoe, 2006 WL 1815808, at *6. We agree with the prior panels. Whether viewed as an injury or an occupational disease, the condition at issue here was caused solely by mental or emotional stimuli. Therefore, the requirements set out in Bacon, 808 S.W.2d at 52, and Houser, 36 S.W.3d at 72, must be satisfied in order for Mr. Brown to recover.

Alternatively to his occupational disease theory, Mr. Brown contends that the increase in stress which he felt as a result of his decision to move to a new route was sufficiently sudden, acute and unusual to satisfy those requirements. Specifically, he submits that he had anticipated the new route would be easier and require fewer hours to complete. However, after his first two days on the route, he began to change his mind. He testified that on the first day, he and Mr. Holder finished the route at 7:00 p.m. On the second day they returned to the terminal at 7:00 p.m. without making all

of the scheduled deliveries and pick-ups.  Mr. Holder then drove him along the route in his own automobile.  On the third  day, the number of deliveries had "piled up" because the route had not been completed the previous day.  That was the last day that Mr. Holder was scheduled to assist Mr. Brown on the route and Mr. Brown knew he would be on his own the next day.  He was increasingly concerned that he would be unable to complete his deliveries in a timely fashion, and that his job would therefore be in jeopardy.  He testified that he shared those concerns with Mr. Holder at the time.

Dr. Ledbetter had treated Mr. Brown for his 1997 stroke and the one at issue in this litigation. She opined that both were related to, or caused in some part by, stress in the workplace, although the 1997 stroke occurred while Mr. Brown was at home on a weekend.   She was questioned at length about the factors or events that precipitated the March 2000 stroke.   She stated:

> Q: You've said that this gentleman's stroke that he had in March of 2000 was related to work.  In looking at the history that he gave you, it does not appear that there is a history that you reported at a time or subsequently that suggested any particular event that – on that date of the stroke that caused it. Is that a fair enough reading?
>
> A: Of the March of 2000?
>
> Q: Yes, ma'am.
>
> A: I don't have any way to review all the events that occurred for him at work on that date.  But I do know that he had expressed great anxiety over his feeling that he was being asked to perform tasks that he was physically unable to do.
>
> * * * *
>
> Q: Okay.  Was it a generalized situation of stress for him, as you suggested or was it a specific event, an unusual or unique occurrence that caused him to have a stroke on that day?
>
> A: My understanding was that – and this obviously is based on the history that I obtained from the patient – was that in general he was being asked to perform tasks that he physically couldn't do.  By my understanding is that either on that particular day or shortly before he was given additional territory.
>
> * * * *
>
> Q: Okay.  If they were not speaking in an angry fashion but speaking in a collegial or friendly fashion, would that tend to suggest he was under abnormal stress or under a normal amount of job-type stress?
>
> A: My impression and my opinion is that over a long period of time he had

been under abnormal stress, trying to keep up with activities that he was physically unable to perform for fear of losing his job.

* * * *

Q: If he suggested in his testimony that there was no acrimony at all between himself and the supervisor on that day or any of the days before when the supervisor had been showing him the route and assisting him with offloading and loading packages, would that not tend to suggest that there was nothing more stressful about that day than other days?

A: My impression over time was that [Mr. Brown] felt considerable stress about pressure that was put on him to perform tasks that he was physically unable to do.

* * * *

Q: As far as his own interpretation of how he got along with his supervisor that day, being friendly and non-acrimonious, would that not tend to suggest that there was nothing abnormally stressful on that day?

A: Whether or not there was a particular point in that day where the stress was higher than the already prior stress really doesn't have any bearing on whether or not the stroke was due to stress over a period of time or stress at one point in time.

Dr. Ledbetter's testimony was consistent with that of Mr. Brown that he had been under significant stress related to his job since before 1997. UPS conceded as much, putting on its own proof that the job of a package car driver was very stressful as a matter of course. However, as quoted above, Dr. Ledbetter was aware that Mr. Brown's stress level had increased as a result of a change in his route (although she was under the mistaken impression that additional territory had been added).

In Cigna Prop. & Cas. Ins. Co. v. Sneed, 772 S.W.2d 422, 424 (Tenn. 1989), an employee sought workers' compensation benefits for depression which she alleged to be the result of her termination from her employment. The trial court denied the claim. The Supreme Court affirmed, noting that there was "no sudden angry or heated confrontation" at the time of her termination. Id. The Court noted that the employee was

"disappointed and upset that she was not being permitted to return to work, but nothing in the nature of an industrial 'accident' is shown to have occurred [on the date of termination]. Concern over employment terms and conditions occurs in all types of occupations and is an inevitable concomitant of any contract of employment."

Id. Similar conclusions have been reached in other cases based upon injuries alleged to result from actual or anticipated termination. See Chapman v. Aetna Cas. & Surety Co., 221 Tenn. 376, 426

S.W.2d 760, 762 (1968)(heart attack after notice of termination); Aycock v. Bridgestone (USA), Inc., No. 01S01-9406-CV-00061, 1995 WL 328734, *6 (Tenn. Workers' Comp. Panel May 31, 1995)(psychological injury after performance review).

More recently, the Supreme Court addressed the compensability of an injury alleged to be the result of fear of termination in Goodloe v. State, 36 S.W.3d 62, 64 (Tenn. 2001). In Goodloe, the employee had been told by her supervisor, who was also a friend, that she was in danger of being fired. Id. Distraught, she took an overdose of anxiety medication while at work. Id. She survived, and brought a claim for permanent disability benefits under the workers' compensation act. Id. The Claims Commission granted the State's motion for summary judgment. Id. at 65. An appeals panel reversed the Commissioner's decision, and remanded the case for trial. Id. The Supreme Court granted review, reversed the panel and reinstated the judgment in favor of the State. Id. at 67-68. The Court reiterated the rule requiring an "identifiable stressful, work-related event producing sudden fright, shock, or excessive unexpected anxiety to justify a recovery." Id. at 67. The Court then went on to observe:

> If the employee in this case under these facts was entitled to recover benefits, then any employee who becomes anxious or depressed over an adverse employment decision or action, such as the possibility of losing a job; a poor evaluation; a transfer; a demotion; a layoff; and the like, would be able to recover benefits. Hence the rule that generalized fear or worry regarding job performance or job security does not rise to the level of a compensable injury.

Id.

Considered in that context, the facts of this case, even when viewed in the light most favorable to Mr. Brown, are insufficient as a matter of law to sustain a finding that his March 2000 stroke was a compensable event. Indeed, the facts of this case are quite similar to those in Bacon, 808 S.W.2d at 46, Sexton v. Scott County, 785 S.W.2d 814, 816-17 (Tenn. 1990), and Lane v. City of Cookeville, No. M2006-00871-SC-WCM-WC, 2007 WL 2284862, *3 (Tenn. Workers' Comp. Panel, August 9, 2007). In each of those decisions, claims based upon injuries alleged to have been caused by stress and anxiety resulting from overwork were held to be non-compensable. Even when the discovery depositions of Dr. Callahan and Dr. Kelley are considered, the case law of this state simply does not allow a finding that Mr. Brown's stroke was a compensable injury or disease. We conclude, therefore, that the judgment of the trial court must be reversed and the claim for permanent total disability alleged to have resulted from the stroke must be dismissed.

**Discretionary Costs**

UPS argues that several items were awarded as discretionary costs which are not recoverable under Rule 54.05 of the Tennessee Rules of Civil Procedure. Discretionary costs are awarded "to the prevailing party unless the court otherwise directs." Tenn. R. Civ. P 54.04(1). Mr. Brown did not prevail on his claim for workers compensation benefits for his disability alleged to have resulted from his stroke. Therefore, the award of discretionary costs is reversed and dismissed.

**Conclusion**

The judgment of the trial court is reversed, and the complaint alleging permanent total disability due to the stroke is dismissed, as is the claim for discretionary costs. The judgment awarding 12.5% permanent partial disability to the body as a whole as a result of the injury to his shoulder is not at issue and therefore, that portion of the judgment is affirmed. Costs of this appeal are taxed to Mr. Brown and his surety, for which execution may issue if necessary.

_____

JERRY SCOTT, SENIOR JUDGE

IN THE SUPREME COURT OF TENNESSEE

AT NASHVILLE

**REX BROWN v. UNITED PARCEL SERVICE, INC. ET AL**

**Circuit Court for Maury County**

**No. 10991**

**No. M2007-00343-SC-WCM-WC - Filed - April 1, 2008**

**JUDGMENT ORDER**

This case is before the Court upon the motion for review filed by Rex Brown pursuant to Tenn. Code Ann. § 50-6-225(e)(5)(B), the entire record, including the order of referral to the Special Workers' Compensation Appeals Panel, and the Panel's Memorandum Opinion setting forth its findings of fact and conclusions of law.

It appears to the Court that the motion for review is not well-taken and is therefore denied. The Panel's findings of fact and conclusions of law, which are incorporated by reference, are adopted and affirmed. The decision of the Panel is made the judgment of the Court.

Costs are assessed to appellant Rex Brown, and his surety, for which execution may issue if necessary.

It is so ORDERED.

PER CURIAM

Koch, J., not participating